# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### CIVIL ACTION NO. 3:18-CV-00547-KDB-DCK

| | | |
|---|---|---|
| WORLEY CLAIMS SERVICES, LLC, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| TOM JEFFERIES; | ) | **ORDER** |
| ALLCAT CLAIMS SERVICES, LLC; | ) | |
| ROBERT WILKEY; AND | ) | |
| TIM SIMMONS, | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

Plaintiff Worley Claims Services ("Worley") is a company that provides, *inter alia*, claims adjusting services to insurance companies. The individual defendants Tom Jeffries, Robert Wilkey and Tim Simmons (collectively the "Individual Defendants") are former Worley employees, and defendant Allcat Claims Services ("Allcat") is their current employer and one of Worley's competitors. In this action, Worley asserts numerous contract and tort claims related to the defendant employees' departure from Worley and alleged breach of the non-competition and non-solicitation provisions in their employment related agreements.

Now before the Court is Defendants' Motion for Summary Judgment on all claims (Doc. No. 56), and Worley's Motion for Partial Summary Judgment on its breach of contract claim against Defendants Wilkey and Jeffries (Doc. No. 41). The primary issues before the Court on these motions are which state's law applies to Worley's claims (the parties dispute the applicable law for both Worley's contract and tort claims), whether the restrictive covenants are enforceable and whether Worley's various tort claims can survive summary judgment.

1

The Court has carefully considered these motions and the parties' briefs and exhibits and heard oral argument from the parties' counsel during a hearing on the motions held December 4, 2019. For the reasons discussed below, the Court finds that neither party is entitled to summary judgment on Worley's breach of contract claims and most of its tort claims, but that Defendants are entitled to summary judgment on a limited portion of Worley's claims for intentional interference with contract and unjust enrichment. Accordingly, the Court will in part **GRANT** and in part **DENY** the Defendants' Motion for Summary Judgment, **DENY** the Plaintiff's Motion for Partial Summary Judgment and enter **Partial Summary Judgment** in favor of Defendants as set forth below.

## I.     LEGAL STANDARD

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A factual dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if it might affect the outcome of the suit under the governing law." *Vannoy v. Federal Reserve Bank of Richmond*, 827 F.3d 296, 300 (4th Cir. 2016) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact through citations to the pleadings, depositions, answers to interrogatories, admissions or affidavits in the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003)**.** "The burden on the moving party may be discharged by 'showing' ... an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Once this initial burden is met, the

burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial," *Id*. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. *Id*. at 324.

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014); *see also Anderson*, 477 U.S. at 255. "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015) (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed.1998)). "The court therefore cannot weigh the evidence or make credibility determinations." *Id*. at 569 (citing *Mercantile Peninsula Bank v. French* (*In re French*), 499 F.3d 345, 352 (4th Cir. 2007)).

However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal citations omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Also, the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *Id*. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Id*. at 249-50.

In the end, the question posed by a summary judgment motion is whether the evidence as applied to the governing legal rules "is so one-sided that one party must prevail as a matter of law." *Id*. at 252.

## II.    FACTS AND PROCEDURAL HISTORY[1]

Worley is a limited liability holding company organized under the laws of Delaware and through its subsidiaries is in the business of providing claims assessment, processing, and adjustment services for insurance carriers throughout the country. For example, after natural disasters Worley provides claims adjusters to insurance companies who do not have enough adjusters to handle the increased number of claims. Worley alleges that the market for its services is national and global and that the industry in which it competes is highly competitive.

Worley has four subsidiaries. Two of the subsidiaries – Worley Specialty Services, LLC and Worley Catastrophe Services, LLC – focus on claims administration, specialty staffing, governmental services, and environmental services. The other two subsidiaries – Alacrity Renovation Services, LLC ("Alacrity") and Nexxus Solutions Group, LLC ("Nexxus") – provide a general contractor network to manage contractors and to coordinate emergency mitigation work. None of the Individual Defendants were involved with either the business of Alacrity or Nexxus. Both Jefferies and Wilkey were, however, managerial level employees at Worley. Jefferies was Vice President of Claims and Wilkey was Director of Flood. Both individuals managed Worley's relationships with some of its largest customers and supervised Worley's regional business operations, while simultaneously supervising lower tier employees.

Wilkey and Jefferies joined Worley subsidiaries following Worley's October 30, 2015 acquisition transaction with their prior employer, North Carolina-based Reid, Jones, McRorie and

---

[1] This summary of the facts is taken from the record as filed by the parties.

Williams ("RJMW").[2] Simmons has been employed by Worley and its affiliates since approximately 2011. There is no dispute that Jeffries and Wilkey were aware of the pending acquisition and knowingly planned to continue working with Worley after the closing.[3]

Indeed, on October 30, 2015, the same day as the acquisition, Jefferies and Wilkey each executed a "Retention Bonus, Noncompete/Nonsolicitation and Confidentiality Agreement" (the "Retention Agreement" or "RA").[4] This Retention Agreement contains the restrictive covenants that are primarily at issue in this action. In the RA, Worley and the employees agreed that they would receive a $100,000 retention bonus (the "Retention Bonus") payable in annual equal installments for two (2) years. As part of the consideration for the Retention Bonus, the RA contains the following non-solicitation[5] provision:

> During the Restricted Period, Employee agrees to not do the following:
>
> (1) Directly or indirectly contact, solicit or encourage a Customer of RJMW Group to deal with Employee, a Competitor of RJMW Group, or any person or entity other than RJMW Group; or
>
> (2) Directly or indirectly accept business from a Customer of RJMW Group; or
>
> (3) Request or advise any customer of RJMW Group to withdraw, curtail, or cease doing business with RJMW Group; or
>
> (4) Employ, hire, solicit for employment or services, advise or recommend to any other person or entity that it employ or solicit for employment or services any

---

[2] As discussed below, the parties dispute whether Worley purchased the stock or just the assets of RJMW in this acquisition.

[3] Wilkey testified he was involved in due diligence meetings between RJWM and Worley. Jefferies was also involved and prepared RJMW's roster of adjusters during the due diligence phase of Worley's acquisition of RJMW. He was also "copied every month on the financial reports" and "knew all of [RJMW's] customers."

[4] Jeffris' and Wilkey's Retention Agreements have the same terms, and other employees also signed the same form agreement at the time of the acquisition.

[5] The Retention Agreement also contained a separate broad non-competition provision (Section 9(B)) that Worley has represented that it does not seek to enforce in this action. Accordingly, the Court has not addressed that provision in this Order and makes no findings regarding its enforceability.

then-current employee, consultant, independent contractor, sales or other representative of RJMW Group; or

(5) Advise, recommend, encourage or solicit any then-current employee, consultant, independent contractor, sales or other representative of RJMW Group to leave RJMW Group's employment or services; or

(6) Directly or indirectly solicit, encourage, or materially assist others to engage in any of the activities restricted of Employee in this Agreement.

Following Worley's acquisition of RJMW, Jefferies and Wilkey were retained and employed by Worley pursuant to their Retention Agreements. Worley entrusted Jefferies and Wilkey to continue to work with the same insurance carriers they previously serviced. Jefferies testified he would frequently visit customers to maintain relationships after Worley's acquisition of RJMW. On March 31, 2017, Jefferies signed a Unit Grant Agreement in which he was given an ownership interest in Worley as part of a performance bonus he received. This Unit Grant Agreement also contained post-employment restrictive covenants that are similar to, but not the same as, those in the Retention Agreement.

On April 24, 2018, Jefferies resigned from Worley. Jefferies disclosed to Worley his intention to work for Allcat. By email, Worley reminded Jefferies of his restrictive covenants after his resignation. Jefferies and Worley later negotiated and executed an agreement (the "2018 Agreement") that released Jefferies from the non-competition obligations in the Unit Grant Agreement. As discussed further below, the parties dispute the effect of the 2018 Agreement on the earlier Retention Agreement. However, there is no dispute that the 2018 Agreement absolved Jeffries of any duty to abide by the restrictive covenants in the Unit Agreement (upon the forfeiture of his equity units).

On May 25, 2018, Simmons, whom Worley had designated to replace Jefferies, also resigned. Simmons did not disclose his intent to work for Allcat. His last day with Worley was June 8, 2018. Unbeknownst to Worley, Simmons had been pursuing employment with Allcat since May 23, 2018. On August 13, 2018, Wilkey resigned from Worley. At the time of his resignation, Wilkey informed

Jim Pearl, Worley's CEO, he planned to work for an "insurance company." However, Worley has presented evidence that Wilkey signed an employment agreement with Allcat five days before giving his resignation and had no job offers from any insurance carriers.

Following these employees' departures from Worley to Allcat, Allcat sought business from customers who had done business with Worley and who had relationships with the Individual Defendants. Also, Allcat sought to use a number of the same independent adjusters whom Worley had previously used in responding to business opportunities after Hurricane Florence formed in September 2018. The parties hotly dispute the details and legal import of these various contacts and sales efforts. Worley contends that Jeffries and Wilkey have directly and/or indirectly violated the non-solicitation obligations in the Retention Agreements and the Defendants deny they have done so. For its part, Allcat contends that it was unaware of the Individual Defendants' restrictive covenants "at the time their offers were extended," but acknowledges that it knew about Jeffries' restrictions in May 2018, not long after his resignation and months before Wilkey joined Allcat.

On October 9, 2018, Worley filed this action seeking injunctive relief and monetary damages. Worley has alleged claims for Breach of Contract as to Wilkey and Jefferies ("Count I"); Breach of Contract as to Simmons ("Count II"); Breach of Fiduciary Duty of Loyalty as to Wilkey and Jefferies ("Count III"); Intentional Interference with Contract as to all Defendants ("Count IV"); Intentional Interference with Prospective Economic Advantage as to all Defendants ("Count V"); Aiding and Abetting Breach of Fiduciary Duty of Loyalty as to all Defendants ("Count VI"); Civil Conspiracy as to all Defendants ("Count X"); and Unjust Enrichment as to all Defendants ("Count XI").

## III.    DISCUSSION

### A.    Choice of Law

In this action, the Court's jurisdiction is based upon diversity of citizenship; therefore, the Court must "apply the substantive law of the state in which it sits, including the state's choice of law rules." *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.,* 386 F.3d 581, 599–600 (4th Cir.2004) (citing *Erie R.R. Co. v. Tompkins,* 304 U.S. 64 (1938); *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.,* 313 U.S. 487 (1941) ("We are of opinion that the prohibition declared in *Erie Railroad* ... against such independent determinations by the federal courts extends to the field of conflict of laws.")). Accordingly, the Court must follow North Carolina's choice of law rules in determining which state's or states' law governs this action.

### 1.    Contract Claims

Under North Carolina choice of law rules, "the interpretation of a contract is governed by the law of the place where the contract was made." *Bueltel v. Lumber Mut. Ins. Co.,* 134 N.C.App. 626, 631 (1999) (citing *Tanglewood Land Co., Inc. v. Byrd,* 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980)). However, "where parties to a contract have agreed that a given jurisdiction's substantive law shall govern the interpretation of the contract, such a contractual provision will be given effect." *Id.*; *Volvo,* 386 F.3d at 600–01 (finding that North Carolina typically gives effect to choice of law provisions). This rule has been applied in the context of covenants not to compete. *See Bueltel v. Lumber Mut. Ins. Co.*, 134 N.C.App. 626, 631 (1999).

Under certain circumstances, however, "North Carolina courts will not honor a choice of law provision." *Cable Tel. Servs., Inc. v. Overland Contr'g, Inc.*, 154 N.C.App. 639, 642 (2002):

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied ... unless either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a

state which has a materially greater interest than the chosen state in the determination of a particular issue and which, under the rule of § 188 [of the Restatement (Second) of Conflict of Laws], would be the state of applicable law in the absence of an effective choice of law by the parties.

Id. at 643.

There is no dispute that both of the contracts at issue – the Retention Agreement and the Unit Agreement – contain choice of law provisions in which the parties agreed that Delaware law would govern the contract. Therefore, unless the Court finds either that Delaware "has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice" or application of Delaware law would be contrary to a fundamental policy of the state which would have been the state of applicable law in the absence of a valid choice by the parties, then Delaware law should apply.

The Court finds that there is a reasonable basis for the parties' choice of Delaware law. Both RJMW and Worley were incorporated in Delaware at the time the contracts were executed. *See Akzo Nobel Coatings, Inc. v. Rogers*, 2011 NCBC 41, 2011 NCBC LEXIS 42 (N.C. Super. Nov. 3, 2011) ("There is no question that Delaware law has a substantial relationship to the transactions [because] Akzo Nobel is a Delaware corporation, and both the Rogers and Taylor Agreements were made with Akzo Nobel."). Further, although Defendants contend that the Individual Defendants' RJMW relationship was based out of a North Carolina office, the Retention Agreements were entered into with Jeffries (a South Carolina resident), Wilkey (a Connecticut resident) and other employees residing in different states. Thus, it is reasonable for RJMW and Worley to choose a single state's law (Delaware, the state of its incorporation which has well-established and robust corporate law precedents) to govern its agreements with all these employees rather than research and revise the agreements to comply with each employee's state's law on restrictive covenants

(and other provisions). Accordingly, there is a reasonable basis for the parties' choice of Delaware law.

Also, the Court finds that the application of Delaware law would not violate a fundamental public policy of North Carolina. As discussed below, Delaware law gives a Court broader authority than North Carolina to "blue pencil" a restrictive covenant to conform to legal requirements, and Defendants do not dispute that the application of Delaware's "blue pencil" rule does not itself violate a fundamental North Carolina public policy. *See Id.*; Doc. No. 59 at p. 5. Moreover, Defendants conceded at oral argument that in the event the Court used its "blue pencil" authority under Delaware law to limit the applicable restrictive covenants to restrictions that do not violate North Carolina public policy then the application of Delaware law would be permitted. As discussed below, the Court will use its "blue pencil" authority under Delaware law to limit the restrictive covenant in the Retention Agreement to a non-solicitation restriction that would be enforceable under the law of either Delaware or North Carolina. Therefore, the application of Delaware law does not violate any fundamental public policy in North Carolina.[6]

Also, while the validity and enforcement of a particular covenant not to compete might be enforceable under Delaware law but not North Carolina law, that does not necessarily mean that the foreign law violates a fundamental public policy of North Carolina. Defendants ask the Court to hold that <u>any</u> covenant not to compete that is not enforceable under NC law violates public

---

[6] Although the Defendants have presented their arguments by reference to North Carolina's alleged public policy, it is not at all clear that North Carolina law would apply in the absence of the application of Delaware law. As stated above, under North Carolina law, the law of the state where the contract was made governs its enforcement. Defendants have not presented any evidence of where the Retention Agreements were executed, which may well have not been in North Carolina because Wilkey and Jeffries were residents of other states, even if RJMW was based in North Carolina. Therefore, the contracts may not have been made in North Carolina, and the public policy of some other state might apply instead.

policy, primarily because North Carolina courts routinely reference "public policy" in discussing the enforcement of restrictive covenants. However, the Court declines to adopt such an expansive holding, particularly in this case where the Individual Defendants are <u>not</u> residents of North Carolina and who worked on customers throughout the country, even if they worked "out of" or were based from an office in North Carolina.

North Carolina (unlike, for example, California) does not have a blanket prohibition on covenants not to compete, although the Court acknowledges that they are more strictly enforced than many other states. At a minimum, Plaintiff had arguably legitimate reasons (protecting its goodwill related to customer relationships and the use of its confidential information) to bargain for these restrictive covenants when it bought the Defendants' employer RJMW and allegedly paid substantial consideration ($100,000) for the Retention Agreements. So, although it is true that the restrictions might be unenforceable if the Court were to consider them under North Carolina law (which the Court has not done and does not decide), on balance the Court cannot conclude that even in the absence of the use of the "blue pencil" rule that applying Delaware law would violate a *fundamental* public policy of North Carolina.

Therefore, the Court will enforce the parties' choice of Delaware law in the relevant contracts and apply Delaware law to Worley's breach of contract claims.

2.      **Tort Claims**

*Lex loci delicti* is the North Carolina choice of law rule for most tort claims.[7] *See Boudreau v. Baughman*, 368 S.E.2d 849, 853-54 (N.C. 1988):

> Our traditional conflict of laws rule is that matters affecting the substantial rights of the parties are determined by lex loci, the law of the situs of the claim, and remedial or procedural rights are determined by lex fori, the law of the forum. For actions sounding in

---

[7] As discussed below, the analysis is different for claims of breach of fiduciary duty and, in this case, aiding and abetting breach of fiduciary duty.

tort, the state where the injury occurred is considered the situs of the claim. Thus, under North Carolina law, when the injury giving rise to a negligence or strict liability claim occurs in another state, the law of that state governs resolution of the substantive issues in the controversy.

"[T]he situs of the tort ordinarily is the state where the last event necessary to make the actor liable or the last event required to constitute the tort takes place . . . ." *Harco Nat'l Ins. Co. v. Grant Thornton, LLP*, 698 S.E.2d 719, 724 (N.C. 2010) (quotation omitted). The parties agree that the law of the state where the claimant sustained its injuries governs tort claims. *See Synovus Bank v. Parks*, 2013 NCBC 40, *24 (N.C. Sup. Ct. July 30, 2013) ("the suffering of damages...[is] the last event necessary to make [another] party liable" in tort). However, they disagree on where Worley was allegedly injured with respect to its various tort claims.

Defendants argue that "Worley's purported injury occurred within North Carolina" and therefore "North Carolina law applies to Worley's tort claims." In response, Worley's position is that its claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty are governed by Delaware law (because Worley is incorporated in Delaware) and that its intentional interference, civil conspiracy and unjust enrichment claims are governed by Indiana law (where its "principal place of business" is located[8] and the harm was felt financially).

In *Harco*, which is cited by both sides, the North Carolina Court of Appeals rejected a bright line rule holding that "harm" is felt by a company where its principal place of business is located:

> The location of a plaintiff's residence or place of business may be useful for determining the place of a plaintiff's injury in those rare cases where, even after

---

[8] In its briefs, Defendants disputed the location of Worley's principal place of business based on a website reference to the "company" headquarters being in Louisiana. However, at oral argument Worley clarified that the website referenced by Defendants related only to the location of a Worley subsidiary, and Defendants did not further challenge that Defendants' principal place of business was in Indiana as testified to by its 30(b)(6) deposition witness.

> a rigorous analysis, the place of injury is difficult or impossible to discern. However, as the examples of *Lloyd* and *United Virginia Bank* indicate, a significant number of cases exist where a plaintiff has clearly suffered its pecuniary loss in a particular state, irrespective of that plaintiff's residence or principal place of business. In those cases, the lex loci test requires application of the law of the state where the plaintiff has actually suffered harm. Therefore, it must be determined whether the record in the instant case sufficiently indicates the state where plaintiff suffered the injury that gave rise to its claims.

*Harco*, 698 S.E.2d at 726. Accordingly, the Court must determine where Worley "actually suffered harm" with respect to its various tort claims.

Defendants argue that the state where the harm was suffered was North Carolina because "99.239%" of Worley's alleged lost revenue is from customers who do business only in North Carolina. While this evidence of monetary damages is some indication of the place of harm, these damages also primarily relate to Worley's contract claims so simply accepting this evidence as dispositive with respect to Worley's tort claims may be misleading. Further, as argued by Worley, this revenue amount does not account for the damages related to other customers, adjusters, etc. nor does it reflect the harm related to Worley's "unjust enrichment" claim, which seeks repayment of the bonuses that Defendants allegedly received (but Worley alleges would not be earned if their restrictive covenants are not enforced).

While this is a close question, because there is substantial evidence that most of the harm caused by the departure and subsequent competition of the three former employees was primarily located in North Carolina it seems most appropriate to apply North Carolina law to the claims for intentional interference with contract and civil conspiracy.[9] However, with respect to Worley's unjust enrichment claim, it is more accurate to say that Worley's harm was felt in Indiana, the state

---

[9] Further, the parties have not identified significant differences between Indiana and North Carolina law with respect to these claims.

of its principal place of business from which it ultimately paid the bonuses that it now seeks to recoup.

There is a different choice of law rule that applies to Worley's claims of breach of fiduciary duty. Under North Carolina law, claims of breach of fiduciary duty are governed by the "internal affairs doctrine," which applies the law of the state of incorporation to claims related to corporate standards of care. *See Bluebird Corp. v. Aubin*, 188 N.C.App. 671, 680 (2008). In *Bluebird*, the court summarized the rule as follows:

> The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs-matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders-because otherwise a corporation could be faced with conflicting demands. *Edgar v. MITE Corp.* 457 U.S. 624, 645, 102 S.Ct. 2629, 73 L.Ed.2d 269, 285 (1982). "States normally look to the State of a business' incorporation for the law that provides the relevant corporate governance general standard of care." *Atherton v. F.D.I.C.,* 519 U.S. 213, 224, 117 S.Ct. 666, 136 L.Ed.2d 656, 668 (1997).

*Id*. Here, Worley is incorporated in Delaware, so – with the agreement of both parties – Delaware law applies to Worley's breach of fiduciary duty claim.

Courts are, however, split on whether to apply the same "internal affairs" conflict of laws doctrine to claims of aiding and abetting breach of fiduciary duty. Some courts do not apply the rule on the grounds that the need for a consistent standard of fiduciary responsibility applicable to officers and directors of a corporation does not apply to the conduct of third-party corporate outsiders that may lead to tort liability for aiding and abetting. *See Islet Sciences, Inc. v. Brighthaven Ventures, LLC*, 2017 WL 129944 (January 12, 2017); *see also Bell v. Kaplan*, 2016 U.S. Dist. LEXIS 24408, *14–15, 2016 WL 815303 (W.D.N.C. Feb. 29, 2016). In both *Islet* and *Kaplan*, the court held that determination of the aiding and abetting issues would not involve a determination as to the nature or extent of the fiduciary duties that were owed by the defendants or the extent to which fiduciary duties were breached; therefore, the need to have the same standard

for corporate fiduciary liability was not impacted by a decision not to use the internal affairs doctrine.

However, in *Butler v. Enhanced Equity Fund II, LP*, 560 B.R. 256 (Bankr. E.D.N.C. 2016), the U.S. Bankruptcy Court for the Eastern District of North Carolina applied the internal affairs doctrine to claims for aiding and abetting breach of fiduciary duty against individuals who were prior directors, officers, and employees of the plaintiff's company. The court recognized that because the defendants "are or have previously been 'bound up' in [the plaintiff's] internal affairs," the internal affairs doctrine "would be [more] appropriate" than *lex loci*. *Id.* at 264. Similarly, in this case, Worley contends that Simmons, Wilkey, Jefferies and others implicated in the aiding and abetting claim were all former high-level employees of Worley and were previously bound up in Worley's internal affairs.

Accordingly, on the particular facts of this case, Worley has the more persuasive argument, and the internal affairs doctrine should control the choice of law related to Worley's claim for aiding and abetting a breach of fiduciary duty. Because all of the Defendants other than Allcat are former corporate insiders and there are significant issues related to who is a fiduciary and whether fiduciary duties have been breached that must be decided as part of the consideration of the aiding and abetting claim, it is most appropriate for the Delaware law to apply to Worley's claims for both breach of fiduciary duty and aiding and abetting that breach.

In summary, the Court will apply North Carolina law to Worley's tort claims for Intentional Interference with Contract and Prospective Advantage and Civil Conspiracy; Indiana law to its Unjust Enrichment claim and Delaware law to its claims for Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty.

B.    **The Contract Claims**

1.    **Enforcement of the Restrictive Covenants**

In their respective motions, the parties argue that they are each entitled to judgment as a matter of law on the issue of the enforcement of the restrictive covenants in the Retention Agreements. Defendants argue that the covenants are unenforceable as a matter of law and Worley argues that not only are the restrictions enforceable but there is also no genuine dispute that they have been breached. The Court disagrees with both sides. Applying Delaware's "blue pencil" doctrine, the restrictions are enforceable as modified by the Court. However, there remain disputed genuine issues of fact as to whether the restrictions have been breached.

To be enforceable under Delaware law, "a covenant not to [solicit] must (1) meet general contract law requirements, (2) be reasonable in scope and duration, both geographically and temporally, (3) advance a legitimate economic interest of the party enforcing the covenant, and (4) survive a balance of the equities." *Am. Homepatient, Inc. v. Collier*, No. 274-N, 2006 Del. Ch. LEXIS 79, 2006 WL 1134170, at *5 (Del. Ch. Apr. 19, 2006). There is no dispute that the Retention Agreements meet general contract law requirements. However, the parties dispute all the remaining elements.

Both Delaware law and the terms of the Retention Agreement allow the Court to modify the restrictive covenant to be reasonable in scope and duration, advance a legitimate economic interest and survive a balance of the equities, thus satisfying all the required elements. "Instead of declaring the entirety of a non-compete invalid …, Delaware courts occasionally modify non-competes that impose broader restrictions than necessary." *FBK Partners, Inc. v.* Thomas, 2010 U.S. Dist. LEXIS 124579, *17 (E.D. Ky. Nov. 23, 2010) (citing Delaware law); *Knowles-Zeswitz Music, Inc. v. Cara*, 260 A. 2d 171 (Del. Ch. 1969) (stating plaintiff could seek enforcement of

narrower geographic area than specified in covenant), *Hammermill Paper Co. v. Palese*, 1983 Del. Ch. LEXIS 400, *17 (June 14, 1983) (modifying off-limits individuals and businesses to those "dealt with, called upon, [and] solicited" by defendants).[10] Further, in Section 9(D)(1) of the Retention Agreements, the parties agreed that in the event that a court finds a portion of the noncompetition agreement unenforceable, then the court "shall" modify the restriction, so the restriction is "enforced to the maximum extent permitted by law." Accordingly, the Court will modify the restrictions under both the authority of Delaware law and as directed by the Retention Agreements.

While the parties dispute whether the Court should modify the restrictive covenant,[11] the parties agree that, if it is modified, the restrictive covenant should be modified to focus on non-solicitation of customers. However, the parties predictably disagree on how to define who is a "customer" for the purpose of the non-solicitation covenants. Defendants argue that "customer"

---

[10] Although they acknowledge that "Delaware courts will, in some circumstances, blue pencil an otherwise unenforceable restriction," Defendants urge the Court not to use this authority based on *dicta* in *Delaware Elevator Inc. v. Williams*, 2011 Del. Ch. LEXIS 47 (Del. Ch. Mar. 16, 2011). In *Delaware Elevator*, a Vice Chancellor of Delaware's Chancery Court applied Maryland law in modifying a restrictive covenant, but expressed his disapproval of the use of Delaware's blue pencil doctrine, arguing that enforcing only so much of a restriction as the court deems reasonable "puts the employer in a no-lose position." This Court respectfully disagrees. First, an employer intentionally including an overbroad restrictive covenant in an employment contract puts itself at a significant risk that the reviewing Court might well exercise its discretion not to use "blue penciling" to save the covenant or may limit the restrictions beyond what the employer could have achieved with a more reasonable provision. Also, the overriding salutary purpose of "blue penciling" is to avoid the unfairness to both the employee and the employer of a legal rule that requires a court to choose to either enforce all or none of a restrictive covenant in circumstances where, for example, the parties may have relied on a restrictive covenant to allow an employee to have broad access to confidential information and support for developing customer relationships only to find, perhaps years later or after substantial consideration, that the law may make the restrictive covenant unenforceable. Moreover, in cases such as this one in which the parties expressly authorized the Court to modify the restrictive covenant, the Court should not refuse to do so if it can be fairly done.
[11] Worley argues that the provision does not need to be modified and the Defendants say that it can't properly be modified.

cannot be defined by the Court because to do so requires that the Court "rewrite" the parties agreement to decide issues such as how recently a "customer" needed to have done business with Worley, whether the "customer" intended to do so in the future and how much of a relationship, if any, did the Defendants need to have with the "customer." In response, Worley asks the Court to simply apply the "plain meaning" of customer, although it fails to further elaborate on that meaning.

Again, the Court will chart a course between the two parties. The Court finds that the non-solicitation provision in the Retention Agreement (as it relates to customers)[12] should be modified to prohibit, during Jeffries and Wilkey's employment and for a period of two years following their departure from Worley, any unauthorized direct or indirect solicitation of or accepting of insurance claims adjusting or related business from a <u>then current Worley customer with whom they or those they supervised had a business relationship</u>.[13] Whether or not any entity with whom Jeffries or Wilkey (or those they supervised) had a relationship was a "then current" customer at the time each of the defendants left Worley is a fact issue that, if disputed, will be decided by the jury based on all the relevant evidence.[14] As so modified, this limited non-solicitation restriction advances Worley's legitimate economic interest in protecting the relationships that defendants (and those

---

[12] The "non-customer" restrictions in Section 9 (A) related to soliciting of employees, etc. are similarly modified to apply only to those then current employees, etc. with whom Jeffries and Wilkey and those they supervised had a business relationship.

[13] Wilkey and Jeffries are also prohibited from violating Section 9 (A)(3) with respect to similarly defined "customers" for the same period of time.

[14] The parties suggested at oral argument that the Court consider defining who is a Worley "customer" by reference to whether or not the entity had a "contract" with Worley. However, it became clear to the Court from the parties' subsequent arguments that there were admittedly current customers who did business with Worley without having a contract and there might be circumstances in which the existence of a contract would not alone establish that an entity was a current customer at the time that the defendants left Worley. Again, the jury will decide, based on all the relevant circumstances, whether or not any entity was a "then current" customer within the restrictive covenant.

they supervised) had with Worley customers, is reasonable in terms of its scope and duration and fairly balances the equities among the parties. Accordingly, it is enforceable under both Delaware and North Carolina law.

Having determined the scope of the enforceable non-solicitation restriction, the Court must consider if there is a genuine issue of material fact with respect to whether the defendants have breached the restriction. The Court readily finds that there are a number of factual disputes as to the breach of the restrictions. The parties dispute, with respect to one or more companies, whether they qualify as a "customer" and whether defendants' activities constitute direct or indirect solicitation. Also, the parties may presumably dispute whether defendants had a prior relationship with particular entities. None of these factual disputes can properly be decided by the Court at summary judgment. Therefore, both Worley's motion for partial summary judgment and Defendants' motion for summary judgment on Worley's claim for breach of contract against Jeffries and Wilkey will be denied.

### 2. Other Issues Related to Worley's Contract Claims

In addition to their primary attack on the enforceability of the restrictive covenant in the Retention Agreement, Defendants raise several other challenges related to the contract claims. First, they argue that Worley does not have standing to enforce the Retention Agreements because they were allegedly required to be assigned and there has been no valid assignment. Second, they argue that the Retention Agreements were superseded. Third, Wilkey (but not Jeffries) argues that there was no consideration for the Retention Agreements because the retention bonus was never paid. And, finally, Jeffries claims that the restrictions were waived in the 2018 Agreement terminating the Unit Agreement and/or were orally modified after that agreement. As discussed below, none of these issues support a finding that Defendants are entitled to summary judgment,

either because they are not correct as a matter of law or reflect disputed factual issues that must be resolved at trial.

a)      **Assignment**

Defendants contend that Worley does not have standing to enforce the Retention Agreements because it failed to obtain a valid assignment of the agreements. Worley's first response is that assignment of the agreements was not required because Worley purchased the stock of RJMW and thus the rights to enforce the agreements were transferred by operation of law. *See Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, 2010 Del. Ch. LEXIS 15 (Del. Ch. Jan. 29, 2010). While Defendants raise speculative questions about whether the transaction was a stock sale or an asset sale, they have not presented evidence to counter Worley's 30(b)(6) deposition in which Worley's President testified that Worley bought the stock of RJMW.[15] Therefore, there are no grounds on which the Court could grant summary judgment to Defendants on this issue.

Further, Worley argues that it has its own standing to enforce the Retention Agreements as a third-party beneficiary. *See Ark. Teacher Ret. Sys. v. Alon USA Energy, Inc.*, 2019 Del. Ch. LEXIS 245 (Del. Ch. June 28, 2019) (requiring proof that (i) the contracting parties intended the third-party to benefit from the contract, (ii) the benefit was intended as a gift or in satisfaction of a pre-existing obligation, and (iii) the intent to benefit the third-party was a material part of the parties' purpose in entering into the contract) (citations omitted). The intent to benefit Worley and the employees' agreement and understanding that Worley would be, for all practical purposes, the counterparty who would be performing and enforcing the Retention Agreements in the future, is plainly evidenced by Worley's acquisition of RJMW on the very day the Retention Agreements were executed and a provision in the acquisition agreement that provides that the Retention Agreements will be executed

_____

[15] The parties dispute whether or not the acquisition agreement was requested in discovery, but it has not been produced among the parties nor filed with the Court.

and delivered to Worley (if the agreements weren't being assigned then why else would this be required). Also, the defendants acknowledge that they understood they were being retained by Worley and Jeffries and Wilkey have both stated[16] that Worley paid them their retention bonuses (which itself would estop Jeffries and Wilkey from denying that the Retention Agreements could be enforced by Worley).

In sum, whether Worley's acquisition of RJMW was a 1) stock sale and an assignment was not required, 2) the Retention Agreements were assigned through the acquisition and the clear intent of the parties or 3) the defendants are estopped from denying Worley's right to enforce the agreement as a result of their acceptance of the retention bonuses, Defendants are not entitled to summary judgment on Worley's contract claims based on Defendants' argument that Worley lacks standing to enforce the Retention Agreements.

### b) Allegedly Superseding Agreements

Defendants also argue that the Retention Agreements were superseded by a later offer of employment to Wilkey and Jeffries' Unit Grant Agreement. The Court does not find these arguments persuasive. While the employment offer and the Unit Agreement contain "merger" or "entire agreement" provisions, those terms are expressly limited to prior understandings and agreements specifically related to the subject matter of the later agreements, which does not encompass the Retention Agreements. Also, as with Defendants' assignment defense discussed above, if Worley paid and the Defendants accepted one or more of the $50,000 retention bonus payments after these later agreements then that strongly supports a finding that the Retention Agreements had not been superseded.

---

[16] Prior to the litigation, Wilkey wrote in an email that he received both installments of the retention bonuses, but he has now recanted that admission.

### c) Payment of the Retention Bonuses

Defendants also contend, with respect to Wilkey but not Jeffries,[17] that Worley did not pay the $100,000 retention bonus so Worley cannot enforce the Retention Agreements. At a minimum there is a genuine factual dispute about this issue. Despite a prelitigation email in which he admitted that he received two installment bonuses related to the Retention Agreement and paragraph 46 of his unverified Answer in which he made similar admissions, Wilkey alleges that the two payments that he received that totaled more than $100,000 were "performance bonuses" paid in December rather than on the anniversary of the Retention Agreements in October. Worley asserts that the full $100,000 in retention bonuses were paid to Wilkey in two installments, albeit in December and along with much smaller performance bonuses (that reflected his failure to earn a higher performance bonus). Therefore, while this evidence may or may not reflect a genuine factual dispute to be decided by the jury (particularly taken together with Jeffries' admission that he received the retention bonus payments), it plainly cannot be the grounds for any ruling in favor of Wilkey at summary judgment.

### d) The 2018 Agreement and Alleged Oral Modifications

Finally, Jeffries argues that the 2018 Agreement, an undated written "Agreement" signed only by Jeffries in 2018, bars enforcement of the Retention Agreement and/or that prior to and following the 2018 Agreement, Worley's President orally agreed to modify Jeffries restrictions. The Court finds that neither argument is sufficient to warrant summary judgment on Worley's contract claims. First, while the 2018 Agreement between Worley and Jeffries provides that Jeffries will forfeit his Unit shares in exchange for the release of his non-competition restrictions

---

[17] Defendants' counsel acknowledged at oral argument that Jeffries admits that he received two retention bonuses totaling at least $100,000 so this claim applies only to Wilkey.

under the Unit agreement, the 2018 Agreement is plainly focused on the parties' respective rights and obligations under the Unit Agreement and makes no mention at all of the Retention Agreement. While Defendants argue that the absence of a reference to the Retention Agreement should be interpreted to mean that those restrictions were no longer in force, the opposite conclusion – that the 2018 Agreement does not affect the restrictions in the Retention Agreement – is equally, if not more plausible.

Worley argues that the fact that the parties to the 2018 Agreement are the same as those to the Unit Grant Agreement (Parent, Management Company, and Jefferies) rather than the Retention Agreement (Worley), supports their contention that the parties only intended to change Jefferies' obligations under the Unit Grant Agreement, not the Retention Agreement. Finally, Worley paid, and Jefferies accepted, the second half of his $100,000 retention bonus in December 2017 after entering into the Unit Grant Agreement, which Worley claims evidences the parties' intention that the Retention Agreement would not be superseded by the Unit Grant Agreement.

Jeffries also contends that his non-solicitation obligations were allegedly modified in oral conversations with Worley's President. However, paragraph 14 of the Retention Agreement clearly states that the "[a]greement may be modified only in writing by a duly authorized officer." Therefore, even putting aside whether Defendants have established any consideration for the alleged modifications and the facial inconsistency in arguing that "modifications" were made to restrictions that Jeffries contends were totally waived in the earlier 2018 Agreement, the Court finds that the Retention Agreement by its terms does not permit oral modifications.

Therefore, for the reasons discussed above, the Court will deny both parties' motions for summary judgment on Worley's claims for breach of contract.

## C.  The Tort Claims

### 1.  Breach of Fiduciary Duty

With respect to Defendants' motion for summary judgment, the parties dispute two issues related to Worley's claims of breach of fiduciary duty. First, Defendants argue that neither Jeffries nor Wilkey had a fiduciary duty to Worley. Rather, they say that they were just managerial employees, which they argue is insufficient to create a fiduciary duty. *See Triton Constr. Co. v. E. Shore Elec. Servs., Inc*., 2009 Del. Ch. LEXIS 88, at *28-29 (addressing existence of a fiduciary relationship and agency obligations for a lower level managerial employee). In response, Worley cites *Science Accessories Corp. v. Summagraphics Corp*., 425 A. 2d 957 (Del. 1980), in which the Delaware Supreme Court held three employees, each of whom was in charge of a major division of a company and supervised tiers of employees, owed fiduciary duties to their employer. Id. at 960 n. 5, 962-63. Worley claims that Jefferies and Wilkey had fiduciary obligations to Worley by virtue of their job responsibilities as Vice President of Claims and Director of Flood. Defendants disagree that their jobs were sufficient to create any fiduciary duty to Worley. Accordingly, whether or not Wilkey and Jeffries were fiduciaries appears to turn on disputed issues of fact related to their job responsibilities and roles at Worley, which are of course not appropriately decided by the Court on a motion for summary judgment.

Also, the parties have a factual dispute about whether the Defendants breached their alleged fiduciary duties, with Defendants arguing that they were merely preparing to compete or looking for jobs independently (and just coincidentally happened to all end up at the same company) and Worley arguing that Defendants went past the bounds of permissible preparations to compete and/or lied about their new jobs when they left Worley. Thus, this issue is similarly not appropriate for resolution by summary judgment.

## 2.  Aiding and Abetting Breach of Fiduciary Duty

Under Delaware law, a claim of aiding and abetting a breach of fiduciary duty has three elements: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) knowing participation in that breach by a party not in direct fiduciary relationship. *See Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A. 2d 1020, 1039 (Del. Ch. 2006). "Knowing participation" can be proven by a showing that a third party "purposely induced" a breach of the duty of care. *See In re Rural Metro Corp. Stockholders Litig.*, 88 A. 3d 54, 97 (Del. Ch. 2014); *see also Penn Mart Realty Co. v. Becker*, 298 A. 2d 349, 351-52 (Del. Ch. 1972) (refusing to limit aiding and abetting to claims involving fraud, self-dealing or other conflict of interest).

Again, the parties dispute whether the facts support all the elements of this claim, in particular whether Allcat and the other defendants knowingly participated in the alleged breach. Allcat disclaims knowledge of the restrictive covenants and alleges that it did not solicit the employees. Worley says that Allcat knew or should have known about the restrictions and the facts support a reasonable inference that the employees can be held liable on this claim. Therefore, as with the underlying claim of breach of fiduciary duty, there are disputed factual issues related to this claim that require that summary judgment be denied.

## 3.  Intentional Interference with Contract and Prospective Economic Advantage

Worley has asserted claims against all Defendants for Intentional Interference with Contract (Count IV) and Intentional Interference with Prospective Economic Advantage (Count V). In support of their motion for summary judgment, Defendants argue (a) there is no evidence which would support a jury finding of unjustified intentional inducement, and (b) the claims are barred by the economic loss rule. Claims for intentional interference with contract require (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant had

knowledge of the contract; (3) the defendant intentionally induced the third party not to perform the contract; (4) the defendant acted without justification; and (5) the defendant's act caused the plaintiff damages. *Childress v. Abeles*, 240 N.C. 667 (1954). Intentional interference with prospective economic advantage requires the same showings, except there need only be a contract that would have been entered into but for the defendant's conduct. *Tucker Auto-Mation of N.C., LLC v. Rutledge*, 2017 U.S. Dist. LEXIS 105890, at *4-5 (M.D.N.C 2017).

However, the "economic loss rule" bars a tort action arising out of a breach of contract. *See ACS Partners, LLC v. American Group, Inc*., 2010 WL 883663 (W.D.N.C. March 5, 2010), *citing*, *North Carolina Ports Authority v. Lloyd A. Fry Roofing Co*., 294 N.C. 73, 81 (1978) (rev'd on other grounds). Under North Carolina law, tort claims which arise out of breach of contract claims are allowed only in "carefully circumscribed" circumstances. *Broussard v. Meineke Discount Muffler Shops, Inc*., 155 F.3d 331, 347 (4th Cir.1998). The policy behind the "independent tort" exception is to keep open-ended tort damages from distorting contractual relations in light of the fundamental difference between tort and contract claims. *Id.*, 155 F.3d at 346.

While Worley casts its intentional interference claim against Jeffries and Wilkey as a third-party claim for interfering with the contracts of the other Worley employees, that same conduct would be a violation of the restrictive covenants in the Retention Agreements that bar encouraging "any employee …. to leave RJMW Group's employment." *See* Retention Agreement at Section 9 (A) (5-6). Therefore, Worley's intentional interference claims against Jeffries and Wilkey are barred by the economic loss rule.

However, the economic loss rule does not bar the intentional interference claims against Allcat and Simmons, who had no contract or restrictive covenants with Worley. While the

evidence of unjustified interference is disputed, putting an employee to work or assisting an employee in violation of a noncompetition agreement can be actionable under North Carolina law. *See United Labs., Inc. v. Kuykendall*, 370 S.E.2d 375, 388 (N.C. 1988) (rejecting defendant's argument that "it was justified in interfering with the contract because it had a good faith belief that the covenants in question were unenforceable"; finding "the jury could reasonably infer from the evidence presented that defendant … intentionally induced Kuykendall to breach the non-competition covenants of his contract for a purpose 'other than as a reasonable and bona fide attempt to protect the interests of the defendant[.]'"). Here, there are sufficient disputed facts with respect to Allcat allowing Wilkey and Jeffries to work and Simmons assisting them in doing so, despite their restrictive covenants, to permit Worley's intentional interference claims against Allcat and Simmons to proceed to trial. Therefore, the Court will grant partial summary judgment for Defendants Wilkey and Jeffries on Worley's claims for Intentional Interference with Contract and Intentional Interference with Prospective Economic Advantage and deny Allcat's and Simmons's motion for summary judgment on those claims.

### 4. Civil Conspiracy

Worley's civil conspiracy claim (Count X) requires (1) an agreement between two or more persons, (2) wrongful acts done by certain of the alleged conspirators in furtherance of that conspiracy; and (3) injury as a result of that conspiracy. *Strickland v. Hedrick*, 194 N.C. App. 1 (2008); *Combs & Assocs., Inc. v. Kennedy*, 147 N.C. App. 362 (2001). Again, the parties dispute whether there was concerted action among the Defendants to violate the restrictive covenants. Therefore, there are disputed material facts related to this claim that cannot be decided at summary judgment.

### 5. Unjust Enrichment

Worley's final claim is for Unjust Enrichment (Count XI). Under Indiana law, "unjust enrichment requires a party who has been unjustly enriched at another's expense to make restitution to the aggrieved party." *Neibert v. Perdomo*, 54 N.E.3d 1046, 1051 (Ind. Ct. App. 2016) (quotation omitted). "To recover for unjust enrichment, the plaintiff must show that (1) he rendered a measurable benefit to the defendant at the defendant's express or implied request; (2) he expected payment from the defendant; and (3) allowing the defendant to retain the benefit without restitution would be unjust." *Id*.[18]

Defendants seek summary judgment on this claim on the grounds that "a claim for unjust enrichment 'may not be brought in the face of an express contractual relationship between the parties.'" *Id*. Worley responds that there is no contract between Allcat and Worley, and that Worley's claim for unjust enrichment against all the parties is a permissible alternative claim to its breach of contract claims under the Retention Agreement. *See Adams v. Jackson*, 218 F. Supp. 2d 1006, 1013 (N.D. Ind. 2002) (recognizing "parties are allowed to plead alternative legal theories in support of a claim for relief"; however, "there can be only one recovery.") (citations omitted). "[P]laintiffs seeking recovery for breach of contract often plead unjust enrichment in the alternative, because this theory allows for the possibility of recovery even if the court finds that no contract existed or that a contract existed but was unenforceable." *Comentis, Inc. v. Purdue Research Found*., 765 F. Supp. 2d 1092, 1102 (N.D. Ind. 2011) (quotation omitted).

---

[18] Under North Carolina law, Worley must show (1) it conferred a benefit on another, (2) the benefit was consciously accepted, and (3) the benefit was not conferred gratuitously. *Madison River Management Co. v. Business Management Software Corp*., 351 F. Supp. 2d 436, 446 (M.D.N.C. 2005) (citing *Southeastern Shelter Corp. v. BTU, Inc*., 154 N.C. App. 321 (2002).

Worley's theory in support of its unjust enrichment claim is that in the event that the restrictive covenants are unenforceable, Wilkey and Jeffries should not be permitted to retain the retention bonuses allegedly paid to them for the Retention Agreements. While this claim may ultimately be mooted as an alternative claim because of the Court's enforcement of the limited non-solicitation restrictions described above, the Court finds that, as to Wilkey and Jeffries, it is a permissible alternative claim on which those defendants are not entitled to summary judgment.

However, as to Allcat and Simmons, who admittedly had no restrictive covenants, there has been no evidence presented that they received a benefit from Worley for which Worley expected to be paid or enforce some obligation. Therefore, Allcat and Simmons will be granted summary judgment on Worley's claim of unjust enrichment.

## IV.    ORDER

**NOW THEREFORE IT IS ORDERED THAT**:

1. Defendants' "Motion for Summary Judgment" (Doc. No. 56) is **GRANTED** in part and **DENIED** in part;

2. **Partial Summary Judgment** in favor of Defendants is entered on Plaintiff's Claims for Intentional Interference with Contract and Prospective Economic Advantage (Counts IV and V) against the Individual Defendants Jeffries and Wilkey and for Unjust Enrichment (Count XI) against Allcat and Simmons;

3. Except as granted above, Defendants' Motion for Summary Judgment is **DENIED.**

4. Plaintiff's Motion for Partial Summary Judgment is **DENIED;** and

5. This case shall **proceed to trial on the merits on the remaining claims** in the absence of a voluntary resolution of the dispute among the parties.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: December 12, 2019

Kenneth D. Bell
United States District Judge